FILED

Joshua Stewart
18181 Fairhaven Ave.
Santa Ana, CA  92705
(949)514-3441
In Pro Per

2014 NOV -3  AM 11: 40

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY:_____

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

SACV 14 · 01751 CJC (JCGx)

| | |
|---|---|
| Joshua Stewart, | ) **Case No.:** |
| **Plaintiff,** | ) |
| **vs.** | ) **COMPLAINT FOR:** |
| Supreme Abrasives Inc.,  a | ) |
| California Corporation | ) **TRADEMARK INFRINGEMENT** |
| **Defendant.** | ) **AND** |
| | ) **BREACH OF CONTRACT** |
| | ) |
| | ) |
| | ) |

## Jurisdiction

**1.** This Court has original jurisdiction under 28 U.S.C. § 1331.

**2.** This Court has original jurisdiction under 28 U.S.C. § 1338.

1

**2.**        This Court has supplemental jurisdiction pursuant 28 U.S.C. §1367.

**3.**        This Court has personal jurisdiction over the Defendant because the Defendant consented to personal jurisdiction of the California courts and agreed that the Central District of California be the exclusive venue.

## Venue

**4.**        The Venue is correct pursuant to 28 U.S.C. §1391.   A substantial part of the events the Plaintiff is suing for happened in this district and the Defendants place of business is in this district.

## Parties

**5.**        Plaintiff, Joshua Stewart, resides at 18181 Fairhaven Ave., Santa Ana, CA  92705.  Plaintiff is permanently disabled and is being treated for spinal cord and psychological injuries.

**6.**        Defendant, Supreme Abrasives, a California Corporation, place of business is at 16871 Noyes Ave, Irvine, CA 92606.

**8.**         In this complaint, the Licensor is the Plaintiff and the Licensee is the Defendant.

## Statement of Facts

**9.**         The Plaintiff invented a device for crimping sheet metal duct and had filed for U.S. Provisional Patent Application in 2009.

**10.**         The Defendant wanted to manufacture the Plaintiff's crimping device.

**11.**         Attorney Charles Wu, who purported to represent both Defendant and Plaintiff, drafted a license Agreement with amendments, hereafter to be named the "Agreement".  Exhibit (A)

**12.**         The Defendant and Plaintiff wanted to name the crimping device "TURBO CRIMPER" and apply for a trademark.

**13.**         The Defendant and Plaintiff disputed who would own the trademark and Attorney Charles Wu questioned which party first coined the name.  As where the Plaintiff had named his first crimping device "TURBOCRIMPER," in 2005, all parties agreed that the Plaintiff would be named owner of the trademark application.

**14.**         Use of the trademark "Turbo Crimper," through promotion, advertising, and sales, the Plaintiff incurred a lawsuit from Malco Products, alleging trademark infringement against their registered trademark "TurboShear" and causing confusion in the market place.

**15.**         The Plaintiff notified the Defendant to stop using the mark "Turbo Crimper" but was told by Defendant that the Plaintiff would

have to pay for all rebranding and related costs.  The Defendant continued to use the trademark, thereby refusing the Plaintiff control of its own reputation, subjecting the reputation of the trademark owner to the consequences of conduct by the Defendant.

**15.**        The above issues presented a conflict of interest by Attorney, Charles Wu, who purported to represent both the Defendant and the Plaintiff.  The Plaintiff was forced to retain his own attorney at his own cost, to avoid being further railroaded and in attempt to regain control.  The Plaintiff's new attorney handled the trademark law suit with Malco.  Malco dropped the law suit without prejudice.

**16.**        The Plaintiff owns the trademark "TURBO CRIMPER," Registration No. 4,394,563.  Filed July 18, 2011.  Exhibit (B)

**17.**        The Defendants denied paying for the defense of Malco's law suit, breaching Section 10. INDEMNITY, of the Agreement, where the Defendant agreed to assume all responsibility for "and agrees to indemnify the 'Plaintiff' against any and all damages, loses, claims, suits or other expenses whatsoever arising out of the 'Defendant's' promotion, advertising, use, sales, publication, transmission or distribution of the intellectual property products, including 'Plaintiff's reasonable attorney's fees incurred in the defense of any action against 'Plaintiff."

**18.**        The Defendant furnished accounting of royalty reduction on or about June 2014.  The Plaintiff found the Defendant to be unlawfully deducting the costs incurred through Charles Wu's defense of the law suit from the Plaintiff's royalties, breaching section 10. INDEMNITY, of the Agreement.

4

19.     Pursuant provisions of section <u>13.   LOAN FROM LICENSEE TO LICENSOR,</u> of the Agreement, "Licensee shall lend the Licensor sufficient funds for the prosecution of all related intellectual property protection applications, including but not limited to patent, trademark and copyright applications…"

20.     The Defendant, on or about May 10, 2013, denied the Plaintiff sufficient funds to prosecute the patent application, a breach of section <u>13.  LOAN FROM LICENSEE TO LICENSOR</u> of the Agreement.  The Defendants interfered with and hindered the Plaintiff from performing his duties as outlined in the agreement. The Plaintiff had to pay out of his own pocket for Attorney David Flyer to proceed with the prosecution of the patent application.

21.     The Defendants again, on or about November 8, 2013, denied the Plaintiff sufficient funds to prosecute the patent application, a breach of section <u>13.  LOAN FROM LICENSEE TO LICENSOR</u> of the Agreement, in bad faith intended to hinder the Plaintiff from performing patent prosecution to issuance.

22.     As a result of the Defendant's breach of contract, by not funding the patent application, the Plaintiff was unable to further prosecute the patent application to issuance.  The Plaintiff subsequently had to abandon the patent application, thereby losing rights and potential gains from sales for the life of the utility patent.

23.     The Defendants furnished accounting of royalty reduction on or about June 2014.  The Plaintiff found the Defendants to be deducting its own cost of business and overlapping costs for legal work not deducted from the retainers or deposits paid to Charles Wu, making the Plaintiff unlawfully charged against royalties.

24.       As a result from these deductions, unlawfully accounted for by the Defendant, the Plaintiff has not been paid royalties on approximately 3,000 crimping devices sold.

25.       On or about September, 2014, the Plaintiff discovered the Defendant took upon itself and without explicit consent, to redesign the Plaintiff's crimping device, breaching section 7. USE OF INTELLECTUAL PROPERTY, which changed the capacities of which the crimping device could operate.

26.       The Defendant then fraudulently kept using the Plaintiff's old You Tube videos, depicting the original device under license, to promote their new unauthorized, redesigned and faulty device bearing the trademark.  The Plaintiff immediately removed the videos from YouTube and the Defendant's website.

27.       The redesigned crimping device was never approved by the Plaintiff.   Trademark infringement occurred when the Defendant, without authorization, put the new device into commerce, using the Plaintiff's registered trademark, deceiving both the Plaintiff and the customer by advertising with the original licensed device.

28.       As a result of the breaches of contract, the Plaintiff, on or about August 11, 2014, notified the Defendants by email and regular USPS mail of said breaches.  The Defendant did not reply.  The Plaintiff used certified USPS to mail the Defendant notices of breach of contract and a 10 day notice with option to cure.  Subsequently, without response from the Defendant, the Plaintiff on or about September 6, 2014 used certified USPS to mail the termination of the agreement, as set forth in section 16. TERMINATION of the Agreement, accompanied by a Cease and Desist notice.

**29.**     The Defendants "denied" acceptance of both sets of notices sent via certified USPS as per receipts.

**30.**     The Plaintiff subsequently, on October 1, 2014, had the Defendants served by a registered process server the notices of breach of contract, 10 day option to cure, and termination of agreement accompanied by a Cease and Desist notice.

**31.**     The Defendants did not respond to any of the above notices.

**32.**     Trademark infringement occurred again following service of Termination of the Agreement and Cease and Desist letters. The Defendant continues to promote, advertise and sell the intellectual property product using the Plaintiff's registered trademark, "Turbo Crimper," as seen on Defendant's web page.

**33.**     Following the termination, the Defendant breached section <u>19. EFFECT OF TERMINATION OR EXPIRATION</u> of the Agreement by continuing further use of the intellectual property.

**34.**     Plaintiff is suffering damages by the trademark infringements, breaches of contract and non-payment of royalties.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
(TRADEMARK INFRINGMENT UNDER 15 U.S.C. §1114 AND
15 U.S.C. §1125)
### (As against Defendant: Supreme Abrasives)

**35.**        Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 34, inclusive and incorporates them herein by reference, as though set forth in full.

**36.**        The Defendant used the Plaintiff's registered trademark without consent, following the termination of the Agreement, violating 15 U.S.C. § 1114.

**37.**        The Defendant took upon itself, without authorization, to redesign the Plaintiff's patent pending device which changed the capacities of which the device could operate.  The Defendant then knowingly used the Plaintiff's old You Tube videos, depicting the original device under license, put into commerce on the Defendant's website, the unauthorized, redesigned and faulty device which bears the trademark without the consent of the Plaintiff, deceiving the Plaintiff and the customer, violating 15 U.S.C. §1114 and 15 U.S.C. § 1125(a) (1)

**38.**        Under Federal law, Section 32 of the Lanham Act states: "Any person who shall, without the consent of the registrant – use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive… shall be liable in a civil action by the registrant…" 15 U.S.C. § 1114(1)

**39.**          Under Federal law, Section 43 of the Lanham Act states: "Any person who, on or in connection of any goods or services, or any container for goods, uses in commerce any word, term, name, symbol or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which----is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a) (1)

## SECOND CAUSE OF ACTION
(BREACH OF CONTRACT)
### (As against Defendant:  Supreme Abrasives)

**40.**          Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 36, inclusive and incorporates them herein by reference, as though set forth in full.

**41.**          The essential elements to be pleaded in an action for breach of contract are(1) the existence of the contract; (2) the plaintiffs performance on the contract or excuse for non-performance;(3)defendant's breach of the contract; and (4) the resulting damage to the plaintiff.  Lortz v. Connell, 273 Cal. App. @d 286, 290, 78 Cal. Rptr. 6, 8 (1969); see also CACI 300,  303.

**42.**          A copy of the written and duly signed contract, the "Agreement" is attached.  Exhibit (A).

**43.**        The Plaintiff performed and complied with the provisions laid out in the Agreement, by prosecuting the Trademark to issuance.

**44.**        The Plaintiff however was unable to prosecute the patent application to issuance because the Defendant prevented him from doing so by breaching the Agreement by not performing as laid out in section 13. LOAN FROM LICENSEE TO LICENSOR, by not lending the 'Plaintiff' sufficient funds for the prosecution of the patent application.

**45.**        The defendant's breach is defined as defendant's unjustified or unexcused failure to perform.  CACI 300, 303.  It was the Defendant's non-compliance of the covenant of good faith and fair dealings with the Defendant's not lending sufficient funds to prosecute the patent application to issuance, breaching the Agreement.

**46.**        Due to the Defendant's breach of the Agreement, the Plaintiff had to abandon his patent pending which he had been devising since 2008, causing loss of past investment and the potential further gains for the life of the utility patent.

**47.**        Due to the Defendant's breach of the Agreement by not paying royalties due to fraudulent accounting for the Defendant's enrichment, the Plaintiff has been denied payment of Royalties on approximately 3000 units sold.

**48.**        Plaintiff suffered by having to fund, out of his own pocket, to defend the law suit by Malco, for the Defendant's own actions.  A

10

breach of section <u>10. INDEMNITY</u>, section <u>2.  GOODWILL AND OWNERSHIP OF THE INTELLECTUAL PROPERTY,</u> of the Agreement and section <u>5. PROTECTION OF RIGHTS IN THE INTELLECTUAL PROPERTY,</u> as where the "'Defendant' agrees to assist 'Plaintiff' to the extent necessary in the procurement of any registrations for, or to protect any of the 'Plaintiff's' rights in the intellectual property"…

49.        Defendant, Supreme Abrasives' multiple, intentional noncompliance and breaches of the provisions laid out in the Agreement is a violation of the covenant of good faith and fair dealings.  The Defendant only performed when it suited the Defendant's convenience.

50.        If the Defendant fails to perform under all or a portion of a contract but does not repudiate the contract, and expresses a willingness to perform under the contract, the Plaintiff may treat such non-performance as a total breach of the contract if the Plaintiff believes performance is either unlikely or would be forthcoming only when it suited the Defendant's convenience.  Sackett v. Spindler, 248 Cal. App. 2d 220, 230-31, 56 Cal. Rptr. 435 (1967)

## REQUEST FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests:

**51.**          Pursuant The Lanham Act 15 U.S.C § 1117, for unlicensed use of Trademark, the Plaintiff requests general and special damages, as according to proof.

**52.**          Pursuant 15 U.S.C § 1116 and § 1117, the Plaintiff prays for cumulative remedies, and recovering the Defendant's profits in addition to any damages, or other remedies awarded.

**53.**          For the breach of contract that lead to the loss of potential gains of the life of the patent which was subsequently abandoned the Plaintiff pursuant CAL. CIV. CODE § 3300 requests general and special damages, as according to proof. The resulting damage of said breach which caused measurable injury, giving the injured party a right to compensatory damages. Borgonovo v. Henderson, 182 Cal. App. 2d 220,231, 6 Cal. Rptr. 236,243 (1960)


**54.**          For the breach of contract which led to royalties being withheld on approximately 3000 units sold, the Plaintiff requests general and special damages in addition to 7.5% royalties on all units sold, as according to proof.

**55.**          Plaintiff also prays for complete absolution of any and all "LOAN" and any and all legal debt incurred, as the Defendant had no intention of performing as set forth in the Agreement, thereby causing the Plaintiff to abandon the patent application where legal debt was born and lost potential gains for the life of the patent, as according to proof.

**56.**     Plaintiff requests reimbursement of funds, paid out of pocket by Plaintiff, to Attorney David Flyer, for filing requests of reconsideration through Pilot Program and for continuing examination for patent prosecution without funding from Defendants, as according to proof.

**57.**     Plaintiff requests immediate and permanent injunctive relief, barring the Defendant from further use of the Plaintiffs registered trademark "Turbo Crimper", including website bearing the trademark as set forth in section 17. NON-COMPETE , of the Agreement.

**58.**     Plaintiff requests immediate and permanent injunctive relief, barring the Defendants from making and selling any sheet metal crimping device as set forth in section 17. NON-COMPETE, of the Agreement.

**59.**     Plaintiff requests a ruling for any remaining intellectual property products, including all the devices and all advertising mediums be accounted for and destroyed as they were not built to Plaintiff's specs and defamed the Plaintiff's trademark.

**60.**     Any further relief which the Court may deem appropriate.


Dated:  November 3, 2014


By:  JOSHUA STEWART
Plaintiff in Pro Per

1
2
3
4
5
6
7
8
9
10

**EXHIBIT (A)**

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## AGREEMENT

THIS AGREEMENT ("Agreement") is made effective as of October 1, 2010 ("Effective Date") by and between Joshua Alan Stewart (hereinafter, "Licensor"), an individual; and Supreme Abrasives (hereinafter, "Licensee"), a California corporation.

## RECITAL

WHEREAS, Licensor is the sole and exclusive owner of certain created intellectual property entitled Big Crimpin Crimper. ("Intellectual Property") A true copy of the specification of the Big Crimpin Crimper is attached hereto as Exhibit "A." A U.S. Provisional Patent Application having serial number 61/278,548 was filed on Oct. 9, 2009. A U.S. Non-Provisional Patent Application will be filed on or before Oct. 9, 2010.;

WHEREAS, Licensee is engaged in the business of manufacturing and selling of tools and related products (hereinafter, the "Business"), and desires to acquire an exclusive license to use the Intellectual Property in its Business. The products proposed to be used in the Business shall hereinafter be referred to as the "Intellectual Property Product";

WHEREAS, although certain of the Intellectual Property are currently being planned for used in the Business, Licensee does not own and is not acquiring from Licensor any ownership rights or other rights in the Intellectual Property;

WHEREAS, Licensor has the power and authority to grant to Licensee such license.

NOW, THEREFORE, in consideration of the promises and the mutual covenants of this Agreement, the parties hereto agree as follows:

## 1. LICENSE

A. Licensor hereby grants to Licensee, upon and subject to all the terms and conditions of this Agreement, an exclusive license ("License") to manufacture and sell the Intellectual Property Product everywhere. Licensor grants to Licensee the right to engage a third party manufacturer/service provider in connection with this Agreement.

B. All intellectual property applications, including but not limited to patent, trademark, and copyright, comprised within or related to the Intellectual Property herein shall be prosecuted to issuance or final rejection by Licensor at his own cost and expense. Any legal fees relating to the intellectual property application of Licensor, taxes, annuities, working fees, maintenance fees, and/or renewal and extension charges with respect

to such applications and registration shall be paid by Licensor.

## 2. GOODWILL AND OWNERSHIP OF INTELLECTUAL PROPERTY

Licensee agrees that ownership of the Intellectual Property and the goodwill relating thereto shall remain vested in Licensor during both the period of this Agreement and thereafter.

## 3. MUTUAL REPRESENTATIONS AND WARRANTIES

Each party represents and warrants that it has full right, power, and authority to enter into this Agreement and to perform its obligations and duties under this Agreement, and that the performance of such obligations and duties does not and will not conflict with or result in a breach of any other agreement of such party or any judgment, order, or decree by which such party is bound.

## 4. LICENSEE'S TITLE AND PROTECTION OF LICENSOR'S RIGHTS

Licensee agrees that it will not, during the term of this Agreement or thereafter, challenge, contest, or question the validity of Licensor's ownership of the Intellectual Property or any applications and registrations thereof, nor attack the validity of this Agreement, and will not challenge the validity the Intellectual Property. Licensee further agrees that it will not file intellectual property applications relating to the Intellectual Property, or variations thereof, anywhere in the world.

## 5. PROTECTION OF RIGHTS IN THE INTELLECTUAL PROPERTY

Licensee agrees to assist Licensor to the extent necessary in the procurement of any registrations for, or to protect any of Licensor's rights in the Intellectual Property, and Licensor, if it so desires, may commence or prosecute any claims or suits in his own name and/or in the name of Licensee or join Licensee as a party thereto. Licensee shall notify Licensor in writing of any infringements or imitations or uses or circumventions by others of the Intellectual Property which may come to Licensee's attention.

After notification, Licensor shall have sixty (60) days or more by mutual agreement, to determine whether or not any action shall be taken on account of any such infringements or imitations.

After the notice period, if Licensor decides not to institute any suit or take any action on account of any such infringements or imitations, Licensee shall be assigned of said rights and prosecute the action based on the assigned rights at the sole expense of

Licensee.  Alternatively, Licensee may prosecute the action under the name of Licensor at the sole expense of Licensee.

## 6. SCOPE OF USE

Licensee shall use the Intellectual Property only in connection with its Business, and in compliance with any standards, specifications, directions, or information supplied by Licensor or the applicable law and regulations.

Licensee agrees to submit to Licensor from time to time and at Licensor's request to permit Licensor or its duly authorized representative the right to inspect accounting records related to Intellectual Property, Intellectual Property Products, samples of advertising, promotional materials bearing or utilizing the Intellectual Property, its facility to ensure compliance with the terms of this Agreement, and agrees to comply with any other related request(s) by Licensor or applicable law and regulations.

## 7. USE OF INTELLECTUAL PROPERTY

Licensee agrees to comply with any requirements established by Licensor concerning the use of the Intellectual Property, any modifications, derivative works, or variations thereof; to correctly use the phrases that indicate the protection of intellectual property registration, including but not limited to "Patent Pending" or "Patent + assigned patent number(s)" with every use of the Intellectual Property, and to submit in advance of its use all mediums for the publication, distribution, display, broadcast or transmission of the patents to Licensor for approval.

Licensee shall not itself develop or use any modified or derivative works of the Intellectual Property, except as expressly permitted in writing under this Agreement.  When using the Intellectual Property under this Agreement, Licensee agrees to comply substantially with all laws pertaining to the use of Intellectual Property in force in the territories in which it uses the Intellectual Property.

## 8. EXCLUSIVITY AND NONTRANSFERABILITY

The License granted herein is exclusive to Licensee as to the manner of use set forth herein, and is not transferable or assignable by Licensee to any other party without Licensor's prior written consent.  Except as indicated in this Agreement, Licensee may not sublicense any rights or obligations set forth in the License, without the prior written consent of Licensor.

## 9. WARRANTY

Licensor warrants that it is the sole owner of all rights in the Intellectual Property, and that neither this Agreement nor any of the rights licensed herein violate any other party's rights or interests.

## 10. INDEMNITY

Licensee hereby assumes all responsibility for and agrees to indemnify Licensor against any and all damages, losses, claims, suits or other expenses whatsoever arising out of Licensee's promotion, advertising, use, sale, publication, transmission, or distribution of the Intellectual Property Products, including Licensor's reasonable attorney's fees incurred in the defense of any action against Licensor.  In applicable situations, Licensor may request Licensee to obtain advertising injury insurance coverage.  Licensee shall not unreasonably deny said request.

## 11. RELATIONSHIP OF THE PARTIES

This Agreement creates no agency relationship between the parties hereto, and nothing herein contained shall be construed to place the parties in the relationship of partners or joint venturers and partnership, and Licensee shall have no power to obligate or bind Licensor in any manner whatsoever. However, where applicable, Licensee may be considered a related company for the purposes of establishing copyrights, trademark or patent rights in the Intellectual Property based on Licensee's use thereof, and Licensee's use of the Intellectual Property shall inure to the benefit of Licensor.

## 12. ROYALTY

Licensor shall be entitled to royalties calculated as follows:
(A) 7.5% of the selling price of each Intellectual Property Product. Currently, the parties have named the product Big Crimpin Crimper; plus

(B) For the January - February AHR EXPO annual trade show only, 7.5% of the revenue per unit, up to $90 revenue per unit, plus 50% of the revenue exceeding the $90 revenue per unit.  For example, 1 unit sold at $100, Licensor shall be entitled to 7.5% of $90 plus
50% x ($100-$90) = $11.75.

The royalty accounting shall be performed by no less than once every quarter. In the event of refunds made by Licensee to its customers, the above-royalty accounting shall be likewise adjusted to correlate.

## 13.   LOAN FROM LICENSEE TO LICENSOR

Licensee shall lend Licensor sufficient funds for the prosecuting of the patent applications relating to the Intellectual Property using the following terms:

(A) Interest rate: zero;

(B) Duration: same as the term of this Agreement;

(C) Loan principal shall be reduced using the royalty payment obligation of Licensee owing to Licensor until repaid. The periodic accounting statement to Licensor must clear reflect this aspect of accounting.

(D) Balloon payment due on the termination date of this Agreement.

## 14.   TERM

The Agreement shall continue in operation for a period of years five (5) from the date of execution hereof, unless it is terminated earlier pursuant to other sections hereof, at which time all rights hereby shall cease.  This Agreement shall automatically renew unless one party gives 60-day notice to the other party prior to the 5-year termination date of his/its desire not to renew.

## 15.   LICENSEE'S INVENTORY AT TERMINATION

Regarding the Licensee's inventory of the Intellectual Property Product near the termination date of this Agreement ("Residual Inventory"), Licensor shall have the first right of refusal for purchasing the Residual Inventory at Licensee's cost. In connection thereto, by no less than 60 days before the termination of this Agreement, Licensee shall provide Licensor the following information: (1) the inventory information for the Intellectual Property Product it has on hand, (2) its cost, and (3) any other relevant information

Should Licensor decides not to purchase the Residual Inventory, Licensee may dispose of the Residual Inventory as it deems fit.

## 16. TERMINATION

This Agreement shall terminate automatically as set forth below:

(a) In the event Licensee violates any of its obligations under the terms of this Agreement, Licensor shall have the right to

terminate the license hereby granted upon ten (10) days notice in writing, and such notice of termination shall become effective unless Licensee shall completely remedy the violation within the ten-day period and satisfy Licensor that such violation has been remedied; or

(b) If Licensee makes any assignments of assets or its Business for the benefit of creditors, or a trustee or receiver is appointed to conduct its Business or affairs, or if Licensee is adjudged in any legal proceeding to be in either a voluntary or involuntary bankruptcy or insolvent, then all rights granted herein shall forthwith cease and terminate without prior notice or legal action by Licensor.

## 17.  NON-COMPETE

During the term of this Agreement, Licensee shall not carry a similar product to the Intellectual Property Product without Licensor's prior written consent.

After termination of this Agreement, Licensee shall not compete with Licensor using products similar to the Intellectual Property Product.

## 18.  DISPOSAL OF MATERIALS CONTAINING INTELLECTUAL PROPERTY UPON TERMINATION OR EXPIRATION

Licensee shall at Licensor's option either destroy or erase all electronic media, articles, publications, labels, signs, stickers, advertising or promotional materials containing the Intellectual Property or return the electronic media, articles, publications, unused labels, signs, stickers, advertising or promotional materials containing the Intellectual Property to Licensor within thirty (30) days after notice of termination or expiration of this Agreement. In the event of disposal, Licensee shall provide Licensor with a signed certification declaring that all its materials containing the Intellectual Property have been satisfactorily destroyed or erased.

## 19. EFFECT OF TERMINATION OR EXPIRATION

Upon and after the expiration or termination of this Agreement, Licensee will refrain from further use of the Intellectual Property or any further reference to them, direct or indirect, or anything deemed by Licensor to be similar to the Intellectual Property.

## 20. NOTICES

All notices shall be given or made at the respective addresses of the parties as follows or to the updated addresses from time to time.

Mr. Joshua A. Stewart
736 S. Prospect St.
Orange, CA 92869

Mr. Garrett Greiwe
SUPREME ABRASIVES
16871 Noyes Ave., #B
Irvine, CA 92606

## 21.  MODIFICATION, WAIVER

None of the terms of this Agreement can be waived or modified except by an express agreement in writing signed by both parties. There are no representations, promises, warranties, covenants or undertakings other than those contained in this Agreement, which represent the entire understanding of the parties.  The failure of either party hereto to enforce, or the delay by either party in enforcing, any of its rights under this Agreement shall not be deemed a continuing waiver or a modification thereof and either party may, within the time provided by applicable law, commence appropriate legal proceedings to enforce any or all of such rights. No person, firm, group or corporation other than Licensee and Licensor shall be deemed to have acquired any rights by reason of anything contained in this Agreement.

## 22. EXECUTION IN COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together shall constitute one and the same instrument.

## 23. MUTUAL NON-DISPARAGEMENT

The parties agree that they will not make any statements, either in writing or orally that disparage or tend to hold in disrepute each other or each other's products.

## 24. SEVERABILITY

If any provision of this Agreement is declared by a court of competent jurisdiction to be invalid, illegal, unenforceable, or void then both parties shall be relieved of all obligations arising under such provision, but only to the extent that such provision is invalid, illegal, unenforceable, or void. If the remainder of this Agreement is capable of substantial performance, then each

provision not so affected shall be enforced to the extent permitted by law.

## 25. COSTS AND ATTORNEY'S FEES

The parties agree that in the event of litigation to enforce the terms of this Agreement the prevailing party shall be entitled to recover from the non-prevailing party its reasonable expenses, including without limitation, attorneys' fees and costs.

## 26. CONFIDENTIALITY

Licensee agrees, represents, warrants and covenants that, except as expressly permitted in writing by Licensor, the Agreement and all of its terms, are and shall be treated as confidential and shall not be disclosed, described or characterized to any other person or entity. None of the confidentiality restrictions herein shall apply to Licensor and Licensor is permitted at his discretion to disclose the Agreement and any and all of its terms to any third party (parties) he chooses.

## 27. CHOICE OF LAW

This Agreement is governed and construed in accordance with the laws of the State of California.  Licensee consents to the personal jurisdiction of the California courts and agrees that the Central District of California or the Los Angeles Superior Court be the exclusive venue.

\ \ \

\ \ \

\ \ \

\ \ \

\ \ \

## 28. ENTIRE AGREEMENT

This Agreement contains the entire agreement between the parties relating to the subject matter hereof, and all prior proposals, discussions or writings are superseded hereby. The terms of this Agreement shall be binding upon and shall inure to the benefit of the parties and their successors, heirs and assigns.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused this Agreement to be duly signed as of the dates written below, and to be effective as of the Effective Date.

LICENSOR                                    LICENSEE

JOSHUA ALAN STEWART                          SUPREME ABRASIVES

By: _Joshua Alan Stewart_                    By: _____

Date: _10/8/2010_                            Print Name: _GARRETT GREWE_

                                             Title: _VICE PRESIDENT_

                                             Date: _10·8·2010_

# EXHIBIT "A"

## INTELLECTUAL PROPERTY – PATENT

The Intellectual Property as of the Effective Date of the Agreement
is as follows:

### Patents

1.   "BIG CRIMPIN CRIMPER"    – U.S. Provisional Appl. 61/278,548
(see the enclosed specification)

2.   BIG CRIMPIN CRIMPER – U.S. Non-Provisional Application,
     S/N– T.B.D.

## AMENDMENT TO THE OCT. 8, 2010 AGREEMENT

This Amendment amends the agreement dated Oct. 8, 2010 (effective Oct. 1, 2010) by and between Joshua Alan Stewart (hereinafter, "Licensor") and Supreme Abrasives (hereinafter, "Licensee").

Paragraph 13 is hereby amended as follows:

### 13.   LOAN FROM LICENSEE TO LICENSOR

Licensee shall lend Licensor sufficient funds for the prosecution of all related intellectual property protection applications, including but not limited to, patent, trademark, and copyright applications using the following terms:

(A) Interest rate: zero;

(B) Duration: same as the term of this Agreement;

(C) This loan is a line of credit. Loan principal shall be reduced using the royalty payment obligation of Licensee owing to Licensor until repaid. The periodic accounting statement to Licensor must clear reflect this aspect of accounting.

(D) Balloon payment due on the termination date of this Agreement.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have each caused this Amendment to be duly signed as of the dates written below, and to be effective as of the below-mentioned date.

LICENSOR

JOSHUA ALAN STEWART

By: _____

Date: 2/2/2012

LICENSEE

SUPREME ABRASIVES

By: _____

Print Name: GARRETT GROVES

Title: EXECUTIVE VP

Date: 2.2.2012

S:\Stewart.14463\Supreme\AMENDMENT-1 TO (10.8.2010).wpd          1

1
2
3
4
5
6
7
8
9
10
11

**EXHIBIT (B)**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# United States of America

## United States Patent and Trademark Office

# TURBO CRIMPER

**Reg. No. 4,394,563**

**Registered Sep. 3, 2013**

STEWART, JOSHUA (UNITED STATES INDIVIDUAL)
411 N. LONDONDERRY LN #B
ORANGE, CA 92869

**Int. Cl.: 7**

FOR: CRIMPING TOOLS FOR CRIMPING SHEET METAL PIPES FOR USE WITH POWER
DRILLS, IN CLASS 7 (U.S. CLS. 13, 19, 21, 23, 31, 34 AND 35).

**TRADEMARK**

FIRST USE 10-1-2010; IN COMMERCE 10-1-2010.

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "CRIMPER", APART FROM
THE MARK AS SHOWN.

SER. NO. 85-373,795, FILED 7-18-2011.

TASHIA BUNCH, EXAMINING ATTORNEY



*Acting Director of the United States Patent and Trademark Office*